**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **SIGNAL POINT NETWORKS, LLC** | |
| **Plaintiff,** | **Civil Action No.** |
| **vs.** | |
| **SAMSUNG ELECTRONICS CO. LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**SIGNAL POINT'S ORIGINAL COMPLAINT**

Plaintiff, Signal Point Networks, LLC, (hereafter "Signal Point" or "Plaintiff") files this complaint for patent infringement against Defendants Samsung Electronics Co., Ltd. ("SEC") and Samsung Electronics America, Inc. ("SEA") (collectively "Defendants" or "Samsung"), and alleges as follows:

**NATURE OF ACTION**

1.      This is a civil action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 101 *et seq*., including 35 U.S.C. § 271.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) in that this is a civil action arising out of the patent laws of the United States of America.

2.      Samsung has infringed and continues to infringe at least one claim of U.S. Patent Nos. 7,836,189; 7,890,743; 9,634,911;  and  7,684,333  (collectively the  "Asserted Patents").

3.      Samsung infringes directly, literally and/or by the doctrine of equivalents, contributes to the infringement of, and/or induces infringement of the Asserted Patents by making, using, selling, offering for sale, and/or importing into the United States mobile devices, and related

1

software and services, that incorporate Signal Point's patented wireless-communication, device-configuration, and network-diagnostics technologies, including Samsung Galaxy smartphones and tablets that implement E-UTRA–NR Dual Connectivity (EN-DC), the Extend Unlock proximity-based device-configuration feature, the pre-installed Samsung Members event-and-diagnostics logging application, and Wi-Fi 7 (IEEE 802.11be) Enhanced Distributed Channel Access (EDCA) and Restricted Target Wake Time (r-TWT) channel-access functionality.

4.     Signal Point seeks damages and other relief for Samsung's infringement of the Signal Point patented technology.

## PARTIES

5.     Plaintiff Signal Point is a limited liability company organized and existing under the laws of the State of Texas, with a principal place of business at 6800 Weiskopf Avenue, Suite 150, McKinney, TX 75070.

6.     Signal Point is the true and correct owner of the Asserted Patents and holds all rights necessary to bring this action.

7.     On information and belief, Defendant SEC is a corporation organized under the laws of the Republic of Korea, with a principal place of business at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Korea 443-742.

8.     On information and belief, Defendant SEA is a wholly owned subsidiary of SEC and a limited liability company organized under the laws of New York, with a principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

9.     On information and belief, Defendant SEC owns one hundred percent (100%) of SEA.

10.     On information and belief, SEA imports into the United States and sells in the United States, including in this district, mobile devices.

2

11.    The Asserted Patents are infringed through various Samsung mobile devices. Defendants SEC and SEA are related entities that work in concert to design, manufacture, import, distribute, and/or sell those infringing devices.

12.    Joinder is proper under 35 U.S.C. § 299. The allegations of infringement contained herein are asserted against the Defendants jointly, severally, or in the alternative and arise, at least in part, out of the same series of transactions or occurrences relating to Defendants' manufacture, use, sale, offer for sale, and importation of the same accused products.

13.    On information and belief, Defendants are part of the same corporate family of companies, and the infringement allegations arise at least in part from Defendants' collective activities with respect to Defendants' accused products. Questions of fact common to Defendants will arise in the action, including questions relating to the structure and operation of the accused products and Defendants' infringing acts.

## **JURISDICTION AND VENUE**

14.    This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. §271. This Court has jurisdiction on federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

15.    This Court has both general and specific jurisdiction over Defendants because Defendants have committed acts within this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, directly and through subsidiaries and intermediaries (including distributors, retailers, franchisees, and others), have committed acts of patent infringement in this District, by, among other things, making, using, testing, selling, licensing, importing and/or offering for sale/license products and services that infringe the Signal Point Patents.

16.     The Court has personal jurisdiction over Defendants for at least the following reasons:  (1) Defendants have committed acts of patent infringement in this District and elsewhere in Texas; (2) Defendants regularly do business or solicit business in this District and in Texas, including through their wholly-owned subsidiary entities; (3) Defendants engage in other persistent courses of conduct and derive substantial revenue from products and/or services provided to individuals in this District and in Texas; (4) Defendants have purposefully established substantial, systematic, and continuous contacts with this District, including the physical location at 6625 Excellence Way, Plano, TX 75023, and should reasonably expect to be subject to suit in this District; and (5) Defendant SEA has been authorized to do business in the State of Texas by the Texas Secretary of State.

17.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b). With respect to SEA, venue is proper in this district under 28 U.S.C. §1400(b) because SEA has a regular and established place of business in this district and has committed acts of infringement in this district. On information and belief, SEA's business operations relating to mobile devices, like cell phones, which are devices accused of infringement in this Action, are conducted at its Texas facility located within the Eastern District of Texas located at 6625 Excellence Way, Plano, Texas 75023. Defendant SEA also employs full-time personnel, such as engineers and senior managers in this district. On information and belief, Samsung's business operations relating to mobile devices are conducted at the SEA facility located in this district. Defendant SEA has also committed acts of infringement in this district by commercializing, marketing, selling, distributing, and servicing certain Samsung-branded devices, including but not limited to cell phones, which are devices Signal Point accuses of infringement in this Action. Defendant SEA has designated

4

CT Corporation System, with an address listed in Texas at 1999 Bryan St., Ste. 900, Dallas, TX 75201, as its representative to accept service of process within the State of Texas.

18.    With respect to SEC, a Korean company, venue is proper because suits against foreign entities are proper in any judicial district within the United States.

19.    In other patent infringement matters involving Samsung's mobile devices, such as *Ericsson Inc., v. Samsung Electronics Co., Ltd. et al.*, Samsung has admitted that for patent infringement actions involving mobile devices, venue is proper in this District and that this Court may exercise personal jurisdiction over both SEC and SEA. *See Ericsson Inc., v. Samsung Electronics Co., Ltd. et al.*, No. 2:21-cv-00010-JRG, Defendants' Answer and Counterclaims at ¶¶ 7-8, Dkt. No. 7 (EDTX Feb. 4, 2021); *see also Clear Imaging Research, LLC v. Samsung Electronics Co., Ltd. et al.*, No. 2:19-cv-326, Samsung Defendants' Answer at ¶¶ 7-8, Dkt. No. 23 (EDTX Jan. 22, 2020); *R2 Solutions LLC v. Samsung Electronics America, Inc.*, No. 4:21-cv-00089, Defendant Samsung Electronics America, Inc.'s Answer at ¶¶ 5-8, Dkt. No 14 (Apr. 19, 2021).

20.    Defendants have committed tortious acts within Texas and this District, and the causes of action set forth in this Complaint arise from those acts. Defendants developed, manufactured, imported, distributed, and sold mobile telephone and computing products that infringed the Asserted Patents, which have been imported, offered for sale, sold (directly or through Defendants' online store and distribution network), purchased, and used in Texas and within this District. Defendants also placed infringing products within the stream of commerce, with the knowledge and/or understanding that such infringing products would be sold and/or used in Texas and in this District.

**THE ASSERTED PATENTS**

21.    On November 16, 2010, United States Patent No. 7,836,189, entitled "Multiple Simultaneous Wireless Connections in a Wireless Local Area Network" ("the '189 Patent") issued. Signal Point is the owner by assignment of the entire right, title, and interest in and to the '189 Patent. A true and correct copy of the '189 Patent is attached as **Exhibit A**.

22.    On February 15, 2011, United States Patent No. 7,890,743, entitled "Method and Apparatus for Configuring a Device Based on Proximity to Another Device" ("the '743 Patent") issued. Signal Point is the owner by assignment of the entire right, title, and interest in and to the '743 Patent. A true and correct copy of the '743 Patent is attached as **Exhibit B**.

23.    On April 25, 2017, United States Patent No. 9,634,911, entitled "Communication Device Event Captures" ("the '911 Patent") issued. Signal Point is the owner by assignment of the entire right, title, and interest in and to the '911 Patent. A true and correct copy of the '911 Patent is attached as **Exhibit C**.

24.    On March 23, 2010, United States Patent No. 7,684,333, entitled "Reliable Quality of Service (QoS) Provisioning Using Adaptive Class-Based Contention Periods" ("the '333 Patent") issued. Signal Point is the owner by assignment of the entire right, title, and interest in and to the '333 Patent. A true and correct copy of the '333 Patent is attached as **Exhibit D**.

**FACTUAL BACKGROUND**

25.    Signal Point Networks, LLC is the owner by assignment of the entire right, title, and interest in and to the Asserted Patents, including all rights to recover for past and future infringement. The Asserted Patents claim foundational technologies in wireless and packet-based communications, mobile-device configuration and security, and on-device network diagnostics and quality-of-service provisioning, as described in the Overview of the Patented Technology above.

26.    Samsung is one of the world's largest manufacturers and sellers of mobile devices. Samsung designs, makes, imports, markets, sells, and supports the Galaxy line of smartphones and tablets in the United States, including in this District, and provides the software, features, and services that operate on those devices. As set forth below and in the exemplary claim charts attached as Exhibits E through H, Samsung's Galaxy devices and their associated software and services incorporate and practice the inventions claimed in the Asserted Patents.

27.    Multiple Simultaneous Wireless Connections (the '189 Patent). Samsung's Galaxy 5G devices implement E-UTRA–NR Dual Connectivity (EN-DC), the 5G Non-Standalone architecture in which a device maintains concurrent, simultaneously active connections to an LTE Master Node and a 5G NR Secondary Node to aggregate bandwidth and improve performance. Samsung has publicly promoted and demonstrated this dual-connectivity capability, including a 2019 EN-DC test on the Galaxy S10 5G achieving 2.65 Gbps of aggregate throughput across simultaneous LTE and NR links, and a 2021 demonstration on the Galaxy S20+ reaching 5.23 Gbps using EN-DC.

28.    Proximity-Based Device Configuration (the '743 Patent). Samsung's Galaxy devices implement the Extend Unlock feature (formerly Smart Lock), which automatically configures a device's lock-screen behavior based on the device's proximity to a registered trusted device, such as a Galaxy Watch, Bluetooth earbuds, or a car Bluetooth audio system. Samsung instructs users how to register trusted devices and explains that the device remains unlocked while connected to a trusted device and reverts to a locked state when the trusted device leaves proximity.

29.    On-Device Event Capture and Diagnostics (the '911 Patent). Samsung pre-installs the Samsung Members application on its Galaxy devices and uses it, together with the device's system-logging and bug-report capture, to detect on-device events, associate timestamps with

those events, and store them in device-resident log files for diagnosis—alongside timestamped records of network packets sent and received by the device.

30.     Wi-Fi 7 Quality-of-Service Provisioning (the '333 Patent). Samsung's newest flagship Galaxy devices, including the Galaxy S25 and the Galaxy S26 Ultra, support Wi-Fi 7 (IEEE 802.11be) through Qualcomm FastConnect connectivity systems and implement EDCA together with Restricted Target Wake Time scheduling to allocate channel bandwidth among different classes of traffic. Samsung identifies Restricted TWT ("r-TWT") as a Wi-Fi 7 feature that supports predictable, low-latency, low-jitter transmission. R-TWT, a foundational capability of Wi-Fi 7, helps to transform wireless networks into managed environments, promoting the low-latency and low-jitter transmissions required for demanding applications.

31.     By building its products, features, software, and related services on Signal Point's patented technologies, Samsung infringes, and induces and contributes to the infringement of, the Asserted Patents by making, using, selling, offering for sale, and/or importing into the United States the Accused Products (defined below). This has caused, and continues to cause, substantial and irreparable harm to Signal Point.

## OVERVIEW OF THE PATENTED TECHNOLOGY

32.     The Asserted Patents arose out of pioneering research and development in the field of wireless and packet-based communications networks by Alcatel Lucent and Avaya. At the time of the inventions, the explosive growth of wireless local area networks ("WLANs"), Voice over Internet Protocol ("VoIP"), mobile computing, and converged voice-and-data devices was straining the capabilities of existing network architectures. The inventors recognized that the conventional approaches of the day—single-access-point associations, manually configured devices, coarse packet-only diagnostics, and undifferentiated channel contention—could not deliver the seamless mobility, reliability, security, and quality of service that modern users and

8

enterprises had come to demand. The Asserted Patents each solved a distinct and then-unmet technical problem, and together they reflect a forward-looking body of work that anticipated the architecture of today's smartphones, tablets, and wireless infrastructure.

**The '189 Patent**
**Multiple Simultaneous Wireless Connections**

33.     The '189 Patent is directed to a novel method and apparatus for forming and maintaining multiple simultaneous wireless connections between a single wireless client and two or more wireless access points in a wireless local area network. Before the invention, prevailing wireless standards generally required a wireless client to be associated with no more than one wireless access point at a time. As a result, when signal characteristics deteriorated—for example, as a user carrying a mobile device moved through space—the client was forced to disassociate from its current access point, scan for a new access point, and then establish a fresh association and authentication with that new access point. As the '189 Patent explains, this conventional handoff process could take up to or in excess of 100 milliseconds, an interval that exceeded acceptable limits for real-time applications such as voice and video transmissions. '189 Patent at 1:59-2:5.

34.     The inventors—Sheng Sun and John Dunning—recognized that this single-association constraint was a fundamental bottleneck to the reliable delivery of real-time services over wireless networks, and they devised an elegant solution. According to the invention, a wireless client is configured to associate simultaneously with multiple wireless access points at the same time. Upon forming a primary association with one access point, the client continues to scan for beacon signals from other adjacent access points and forms additional associations with them. The client notifies its primary access point of the identity of the other access points (for example, by appending access point identification information to a modified request-to-send

("RTS") message), and likewise notifies the secondary access points of the primary. The access points then exchange connection, session, flow, and state information with one another—using, for example, an extension to the Inter-Access Point Protocol ("IAPP")—so that the information required to support the client has already been shared in advance of any handoff. '189 Patent, Abstract; 5:60-6:50.

35.    The benefits of this architecture are significant and were ahead of their time. By pre-sharing state, flow, and other information among multiple access points and pre-establishing network-level connectivity on the client's behalf, the invention enables handoffs to occur "quickly and seamlessly," eliminating the latency penalty that had previously degraded real-time wireless applications. The invention further permits multiple access points to be designated as primary access points for different flows, sessions, or types of communication—allowing, for example, one access point to serve voice traffic while another serves data—and even permits multiple access points to cooperatively and simultaneously transmit data to a single client to increase throughput, such as by splitting a large file and sending each half from a different access point so that the client receives the data twice as fast. '189 Patent at 9:30-43; 7:40-49. The '189 Patent thus describes foundational techniques for fast, seamless mobility, link aggregation, and multi-connection wireless service that remain central to the performance of modern wireless devices.

### The '743 Patent
### Configuring a Device Based on Proximity to Another Device

36.    The '743 Patent is directed to innovative methods and apparatus for automatically configuring a user device based on its proximity to one or more other devices. The inventors— Annette L. Buchanan, Sally Ann C. Mcilhinney, Adonny W. Raphael, and Terry E. Schmalzried— recognized a pressing and growing problem: as portable devices such as laptop computers, smartphones, and tablets became smaller, lighter, and more valuable, they also became

increasingly easy to steal or lose, and existing protections were inadequate. '743 Patent at 1:12-30. Mechanical solutions such as physical locks and keys added bulk and inconvenience, while conventional access controls relied on passwords or keys that could be spoofed, guessed, or stolen. *Id*. at 1:21-40.

37.    The '743 Patent solved these problems through an intelligent, context-aware configuration scheme. According to the invention, a protected user device stores one or more configuration rules—maintained in a "proximity rulebase"—that establish one or more configuration parameters of the device based on its proximity to one or more additional general-purpose devices. The device determines whether the configuration rules are satisfied (for example, by detecting whether a designated enabling device, such as the owner's cell phone, RFID tag, or WiFi router, is within a defined range), and automatically configures itself accordingly. '743 Patent, Abstract; 3:13-4:62. The proximity may be defined flexibly—as a radius around a device, presence in the same room or building, or presence within communication range—and may be detected using identifiers such as a username, physical location, processor identifier, Media Access Control ("MAC") address, Service Set Identifier ("SSID"), or IP address. *Id*. at 2:66-3:13.

38.    The configuration parameters governed by the invention are remarkably broad and powerful, encompassing whether the device may operate at all, access-control parameters, parental-control parameters, quiet or mute modes, and suspend modes—and may even trigger local processes such as alarms or notifications. *Id*. at 1:58-2:5. The patent describes diverse, commercially valuable use cases that presaged features now ubiquitous in modern mobile devices: a laptop that operates only when within range of its owner's phone; a child's device that enables parental controls when near a parent's phone and limits functionality when away; a device that automatically enters a quiet mode upon entering a library; and a retail device that remains disabled

11

until it reaches the buyer's home. *Id.* at FIGS. 2A-2C; 3:46-5:11. By tying a device's behavior and security to its physical context in a flexible, owner-configurable manner, the '743 Patent anticipated today's proximity-based unlocking, geofencing, trusted-device, and contextual-configuration technologies.

### The '911 Patent
### Communication Device Event Captures

39.    The '911 Patent, invented by Jean Meloche, is directed to a significant advance in network monitoring and diagnostics for communication devices. The inventor recognized a real and recurring problem confronting service technicians: while conventional network monitoring tools could capture a packet trace of the traffic sent to and from a communication device, a bare packet trace, standing alone, often did not allow a technician to quickly identify the root cause of a communication failure. '911 Patent at 1:10-30. Frequently, the key to diagnosing a problem lay not in the packets themselves but in an event occurring within the device—such as a user interaction or a timer event—that the packet trace could not capture. *Id.*

40.    The '911 Patent solved this problem by fully integrating device-level events into the diagnostic record. According to the invention, a user interaction or a timer event is detected in a communication device; a timestamp is associated with that interaction or event; and, in response to detecting it, the interaction or event and its timestamp are stored in a packet log file associated with the device. '911 Patent, Abstract. The same packet log file can also contain a packet trace of the packets sent to and received by the device, each with its own timestamp, so that the user interactions and timer events can be displayed chronologically in relation to the packets—giving a technician a complete, time-ordered picture of everything that happened in and around the device. *Id.*

12

41.    The invention is notable for the breadth and ingenuity of its disclosure. The captured user interactions may include keypad presses, button pushes, keyboard typing, voice commands, selections, and gestures, as well as outputs provided to the user such as ringing, dial tones, caller-ID indications, and voice-mail indicators; the captured timer events may include packet timers, power-conservation timers, packet-resend timers, back-off timers, input-response timers, and watchdog timers. '911 Patent at 2:60-3:25. In a particularly inventive aspect, the device-level events are stored within the packet log file in the same format as real packets—as "malformed" packets bearing a bogus source or destination address—so that they can be viewed seamlessly alongside genuine packets in a single chronological trace, and the resulting log files from multiple devices can be combined by a network management system to build a composite, cross-device diagnostic view. *Id*. at 7:9-25; 5:1-8. This integration of human and machine events into a unified, timestamped diagnostic record represented a meaningful and valuable improvement over prior packet-only monitoring tools.

**The '333 Patent**
**Reliable QoS Provisioning Using Adaptive Class-Based Contention Periods**

42.    The '333 Patent is directed to inventive methods and systems for reliably allocating the bandwidth of a wireless channel among different types of traffic, thereby providing dependable quality of service ("QoS") in wireless networks. The inventors—Abel Clement Dasylva, Zhonghui Yao, Delfin Montuno, Michel Ouellette, James Aweya, Wenfeng Chen, and Kent Felske— confronted a well-known and worsening problem in WLANs: as traffic increased, high-priority and real-time traffic such as voice and video became unreliable because all nodes contended with one another for the shared wireless medium. '333 Patent at 1:30-48. Under the prevailing 802.11e Enhanced Distributed Channel Access ("EDCA") approach, giving priority to high-priority traffic

13

created a serious side effect—high-priority traffic could effectively starve low-priority traffic, such as data, preventing it from gaining access to the medium altogether. *Id*. at 1:55-2:14.

43.     The '333 Patent solved this problem with an elegant and flexible architecture of class-based contention periods. According to the invention, the bandwidth of the wireless channel is partitioned into a plurality of contention periods; traffic flows are associated with access categories (for example, voice, video, background, and best-effort); and one or more of the access categories are assigned to each contention period, such that during a given contention period only the traffic flows associated with a proper subset of the access categories contend for the channel. '333 Patent, Abstract; 3:27-4:8. The contention periods may be of the same or different durations, and those durations may be fixed or adjustable, allowing the network to tailor how much channel time each class of traffic receives and when. *Id*. at 3:55-67. By isolating traffic in this way, the invention guarantees that every class of traffic obtains some share of the channel—so that high-priority voice traffic can no longer perpetually starve low-priority data traffic—while still affording differentiated, protected treatment to delay-sensitive flows. *Id*. at 7:8-25.

44.     The invention further provides powerful mechanisms for tuning and adapting QoS to real-world conditions. Higher-priority access categories may be assigned to a greater number of contention periods or to contention periods of longer duration, and the durations of the contention periods—and the scheduling mechanism used to sequence them—may be fixed or dynamically and adaptively changed during network operation in response to monitored load conditions, service requirements, packet size, packet latency, and packet loss. '333 Patent at 3:55-67; 8:14-10:42. The patent thus describes a sophisticated, adaptive framework for delivering reliable, differentiated quality of service over congested wireless networks—an objective of central and enduring importance to the performance of modern voice, video, and data communications. These same

14

building blocks—a channel partitioned into contention periods, traffic sorted into per-class access categories, and the assignment of only a proper subset of those categories to any given period—are the foundation of the channel-access mechanisms used in today's most advanced Wi-Fi networks, as explained below.

45.     The class-based framework at the heart of the '333 Patent maps directly onto the quality-of-service architecture of modern IEEE 802.11 (Wi-Fi) networks. Under that architecture, each traffic flow is assigned a User Priority, and every User Priority is mapped to one of four standardized Access Categories—Voice (AC_VO), Video (AC_VI), Best Effort (AC_BE), and Background (AC_BK)—which are the very kinds of traffic classes the '333 Patent describes. This User-Priority-to-Access-Category mapping is the mechanism by which a station associates traffic flows with access categories, sorting each packet into the class that will govern how it contends for the shared medium. Standing alone, however, the four-access-category model provides only statistical preference through differing contention parameters; it cannot, by itself, guarantee a latency-sensitive flow the protected, bounded access to the channel that real-time applications require—the precise shortcoming of prior contention schemes that the '333 inventors set out to solve.

46.     Wi-Fi 7 (IEEE 802.11be) addresses that shortcoming through Restricted Target Wake Time ("r-TWT"), a mechanism that reserves dedicated, protected Service Periods on the wireless channel for designated latency-sensitive traffic. When an r-TWT schedule is established, the channel's airtime is organized into recurring intervals—the r-TWT Service Periods and the ordinary contention intervals between them—and the schedule designates, through its downlink and uplink Traffic Identifier (TID) bitmaps, the specific traffic entitled to prioritized access during each Service Period. Because each TID corresponds to a User Priority, and each User Priority

15

maps to an Access Category, designating the TIDs for a Service Period necessarily designates a subset of the Access Categories permitted to contend during that period, while the remaining categories are withheld and stations outside the schedule are silenced. Wi-Fi 7 thus partitions the channel into contention periods, associates traffic flows with access categories, assigns a subset of access categories to each period, and confines contention during a given period to that proper subset—the same class-based contention the '333 Patent claimed years before the standard adopted it.

47.     This convergence is no accident of terminology but a convergence of design. The applications driving Wi-Fi 7, augmented- and virtual-reality headsets, cloud and competitive gaming, real-time video conferencing, and other interactive, latency-sensitive media, cannot tolerate the unbounded delay and jitter that result when every flow contends indiscriminately for the medium. To deliver the bounded latency and low jitter those applications demand, modern devices implement exactly the class-based, period-partitioned contention the '333 Patent invention addressed: they reserve dedicated service periods, sort traffic into access categories by User Priority, and permit only a proper subset of those categories to contend during each protected period. As set forth in detail in Count IV below and in the claim chart attached as Exhibit H, the accused Samsung Galaxy Wi-Fi 7 devices implement precisely this functionality—partitioning the 802.11be channel into r-TWT Service Periods, mapping traffic flows to the four access categories through User Priority, assigning access categories to each period by means of the Restricted TWT TID bitmaps, and contending during those periods only by traffic flows associated with a proper subset of the access categories—and thereby practice the methods claimed in the '333 Patent.

48.     A person of ordinary skill in the art reviewing the specifications of the Asserted Patents would understand that the inventors had possession of the claimed subject matter and

would know how to practice the claimed inventions without undue experimentation. Together, the Asserted Patents reflect substantial, non-conventional, and valuable contributions to the fields of wireless networking, mobile device security and configuration, network diagnostics, and quality-of-service provisioning—contributions that addressed real technical problems with concrete, inventive solutions and that continue to underlie the performance, reliability, and security of modern communication devices.

**SAMSUNG'S INFRINGING PRODUCTS AND ACTIVITIES**

49.     Samsung makes, uses, imports, offers for sale, and sells throughout the United States, including in this District, Galaxy-branded smartphones and tablets, together with the software, features, and services that operate on those devices, that practice the inventions of the Asserted Patents. The devices, features, software, and services accused of infringement are collectively referred to as the "Accused Products," and the Accused Products specific to each Asserted Patent are identified below and in the claim charts attached as Exhibits E through H which are incorporated herein by reference.

50.     The '189 Accused Products include Samsung Galaxy 5G smartphones and tablets that implement E-UTRA–NR Dual Connectivity (EN-DC) in accordance with 3GPP TS 37.340, including without limitation the Galaxy S21, S22, S23, S24, and S25 series, the Galaxy A54 and A55 5G, and the Galaxy Z Fold and Z Flip 5G product lines, and other Galaxy devices that support 5G Non-Standalone (EN-DC) operation. The accused functionality is the device's formation and simultaneous maintenance of concurrent active LTE and 5G NR connections with an LTE Master Node and an NR Secondary Node. See Exhibit E.

51.     The '743 Accused Products include Samsung Galaxy S-series, A-series, and Z-series smartphones that implement the Extend Unlock feature (formerly Smart Lock). The accused

functionality is the device's automatic, proximity-based configuration of its lock-screen state based on a registered trusted device. See Exhibit F.

52.     The '911 Accused Products include Samsung Galaxy smartphones running One UI on Android that perform on-device event detection and system-log capture through the pre-installed Samsung Members application (including its Error reports / Send feedback and Diagnostics functions) and the device's associated bug-report capture. The accused functionality is the device's detection of user interactions and timer events, association of timestamps with those events, and storage of the events and timestamps in a device-resident log file that also contains timestamped network packets. See Exhibit G.

53.     The '333 Accused Products include Samsung Galaxy smartphones that operate as IEEE 802.11be (Wi-Fi 7) stations and implement Enhanced Distributed Channel Access (EDCA) together with r-TWT scheduling, including without limitation the Galaxy S25 (Qualcomm FastConnect 7800) and the Galaxy S26 Ultra (Qualcomm FastConnect 7900), and other Galaxy devices that support Wi-Fi 7 EDCA and r-TWT. The accused functionality is the device's allocation of wireless-channel bandwidth among different classes of traffic using EDCA access categories and r-TWT Service Periods. See Exhibit H.

54.     Upon information and belief, Samsung has had knowledge of the Asserted Patents and of its infringement thereof at least as of the filing and service of this Complaint, and continues to make, use, sell, offer for sale, and import the Accused Products. Upon information and belief, Samsung, as a sophisticated technology company that actively develops and standardizes wireless, mobile-device, and connectivity technologies, regularly monitors the patent landscape in these fields, including patents relevant to the cellular, Wi-Fi, mobile-device, and diagnostics technologies embodied in the Asserted Patents, and Samsung monitored or was otherwise aware

18

of the Asserted Patents, including due to their impact on Samsung's plans for its own products and services.

55.    Further, prior to the filing of this Complaint, good-faith licensing discussions were attempted relating to the Asserted Patents via at least correspondence dated June 12, 2026 and June 19, 2026, sent to Samsung's Licensing Director and other Legal Department members (i) expressly notifying Samsung that Signal Point held patents, including an express identification of the Asserted Patents, (ii) identifying the specific technologies covered by those patents, including the Asserted Patents, and (iii) identifying the infringing Samsung products, services, systems, software, platforms and/or features, including identifying the Accused Products as infringing the Asserted Patents. Samsung thus possesses pre-suit knowledge of the Asserted Patents and its infringement thereof.

56.    Despite having knowledge of the Asserted Patents prior to this Complaint being filed, upon information and belief, Samsung did not undertake any serious investigation to form a good faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, Samsung has continued to infringe one or more claims of each Asserted Patent.

57.    Alternatively, to the extent Samsung lacked actual knowledge of the Asserted Patents and/or its infringement thereof before the filing of this action, Samsung was willfully blind. Upon information and belief, to the extent Samsung lacked actual knowledge of infringement prior to the filing of this action, Samsung deliberately avoided confirming infringement despite a subjective belief that there was a high probability that it infringed and continues to infringe the Asserted Patents, and therefore was willfully blind. Upon information and belief, Samsung lacks adequate written policies disseminated to relevant employees regarding monitoring or avoidance of patent infringement by Samsung and lacks adequate mechanisms for employees to report patents

that they believe Samsung may infringe. Upon information and belief, Samsung and its employees subjectively understood that there was a high likelihood that patents covering innovations reflected in the Asserted Patents read on the Accused Products identified in this Complaint.

58. At least as of June 12, 2026, and no later than the filing and service of this Complaint, Samsung has actual knowledge and notice of the Asserted Patents and continues to infringe them.

59. Therefore, upon information and belief, Samsung's infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, flagrant, deliberate, and in conscious disregard of Signal Point's rights, entitling Signal Point to increased damages pursuant to 35 U.S.C. § 284 and to its attorneys' fees and costs pursuant to 35 U.S.C. § 285.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,836,189

60. Signal Point incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

61. Signal Point has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products or services that embody the inventions of the '189 Patent.

62. Samsung has infringed and continues to directly and indirectly infringe the '189 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b) and (c), including by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, the '189 Accused Products. The '189 Accused Products include Samsung Galaxy 5G smartphones and tablets that implement E-UTRA–NR Dual Connectivity ("EN-DC") in accordance with 3GPP TS 37.340, including without limitation the Galaxy S21, S22, S23, S24, and S25 series, the Galaxy A54 and A55 5G, and the Galaxy Z Fold and Z Flip 5G

20

product lines. As shown in the exemplary claim chart attached as **Exhibit E**, these products are covered by one or more claims of the '189 Patent, including at least claim 1.

63.    For example, claim 1 of the '189 Patent is reproduced below:

1. A method of forming multiple simultaneous active wireless connections between a wireless client and two or more separate wireless access points, comprising:

obtaining, by the wireless client, a first primary active affiliation between the wireless client and a first primary wireless access point in a first wireless local area network, the first primary wireless access point providing ongoing communication services to the wireless client on the first wireless local area network by sending data to the wireless client and receiving data from the wireless client on the first primary active affiliation on the first wireless local area network;

obtaining, by the wireless client, a second primary active affiliation between the wireless client and a second primary wireless access point in the first wireless local area network, the second primary wireless access point providing ongoing communication services to the wireless client on the first wireless local area network by sending data to the wireless client and receiving data from the wireless client on the second primary active affiliation on the first wireless local area network;

simultaneously maintaining and using, by the wireless client, the first primary active affiliation between the wireless client and the first primary wireless access point in the first wireless local area network and the second primary active affiliation between the wireless client and the second primary wireless access point in the first wireless local area network, during a period of operation of the wireless client when the wireless client is not engaging in a handoff process between access points on the first primary wireless local area network; and

wherein the first primary wireless access point and the second primary wireless access point are both part of the first wireless local area network.

64.    The '189 Accused Products meet each limitation of at least claim 1 of the '189 Patent, as set forth in detail in the exemplary claim chart attached as **Exhibit E** and as summarized below.

65.    As to the preamble, each '189 Accused Product is a wireless client that performs a User Equipment (UE) side method of forming multiple simultaneous active wireless connections with two or more separate access points. Operating in EN-DC under 3GPP TS 37.340, the Galaxy

21

device establishes and maintains concurrent LTE and 5G NR radio links with an LTE eNB acting as Master Node and an NR gNB acting as Secondary Node, both of which remain simultaneously active and carry live user-plane data during normal operation. Samsung's commercial Galaxy devices support EN-DC dual-active operation through their Qualcomm Snapdragon and Samsung Exynos 5G modems, and Samsung's published specifications confirm simultaneous 5G NSA (EN-DC) operation across numerous NR and LTE bands.



*Samsung Galaxy S25 published specifications confirming 5G NSA (EN-DC) operation.*

66.     As to the first limitation, each '189 Accused Product, at initial network attach, completes the 3GPP RRC connection establishment procedure (the first primary active affiliation) with the LTE eNB Master Node (the first primary wireless access point) within the operator's E-UTRAN access network (the first wireless local area network). Upon establishment, the eNB carries live downlink and uplink user-plane traffic over the established LTE radio bearers, thereby

providing ongoing communication services to the Galaxy device by sending data to, and receiving data from, the device on that affiliation. This is a fully bidirectional, active data-carrying connection, not a standby or signaling-only link.

67.     As to the second limitation, while in the RRC_CONNECTED state on the LTE eNB, each '189 Accused Product completes the EN-DC Secondary Node (SgNB) Addition procedure defined in 3GPP TS 37.340 (the second primary active affiliation) with the NR gNB Secondary Node (the second primary wireless access point) in the same operator E-UTRAN access network. Once added, the gNB carries live downlink and uplink user-plane traffic over the established NR radio bearers and independently schedules uplink and downlink resources for the device, thereby providing ongoing communication services by sending data to, and receiving data from, the Galaxy device on that second affiliation. Samsung publicly demonstrated this dual-active data operation, including a 2019 EN-DC test on the Galaxy S10 5G that combined 1.5 Gbps of NR throughput with 1.15 Gbps of LTE throughput simultaneously, and a 2021 Galaxy S20+ demonstration reaching 5.23 Gbps via EN-DC.

68.     As to the third limitation, each '189 Accused Product simultaneously maintains and uses both the LTE affiliation with the eNB and the NR affiliation with the gNB during steady-state EN-DC operation, concurrently transmitting and receiving live user-plane traffic over both radio-bearer legs, outside of and independent from any inter-node handoff. EN-DC is a sustained operating mode rather than a transient handover mechanism: the device remains dual-connected and aggregates bandwidth from both nodes at the same time rather than switching from one to the other, as Samsung itself explains.

*Samsung explaining that EN-DC "combines the 4G and 5G connections" for a single device*

69.     As to the fourth limitation, the LTE eNB Master Node and the NR gNB Secondary Node are both deployed within the same operator E-UTRAN access network and are part of the same first wireless local area network: they share a common Evolved Packet Core (including the same MME, S-GW, and P-GW), a single network-operator identity (PLMN), and a unified X2-coordinated radio access infrastructure, jointly serving the Galaxy device over EN-DC. Samsung's own architecture white papers confirm that, for all Option 3 variants, the eNB anchors both nodes to the same core network and the en-gNB operates with the eNB over the X2 interface, with no separate independent core for the gNB.

70.     Samsung's infringement of the '189 Patent is shown on a limitation-by-limitation basis in the exemplary claim chart attached as **Exhibit E**. Samsung directly infringes at least claim 1 of the '189 Patent by, for example, using and testing the '189 Accused Products.

71.     Samsung also directs and controls others', for example, customers' and end users', use of the '189 Accused Products and the accused EN-DC dual-connectivity functionality. Samsung also indirectly infringes one or more claims of the '189 Patent under 35 U.S.C. § 271(b) by inducing infringement by others, including, for example, Samsung's customers and end users,

in this District and elsewhere in the United States. Samsung has known of the '189 Patent and its infringement thereof at least as of the communications detailed herein and no later than the filing and service of this Complaint. Since at least that time, Samsung has been on notice of its infringement and actively induced and continues to induce infringement by others. For example, Samsung's customers and end users directly infringe the '189 Patent, as shown, for example, in **Exhibit E,** through their ordinary, intended, and customary use of the '189 Accused Products and the accused EN-DC dual-connectivity functionality. Samsung intends to cause and has taken affirmative steps to induce that direct infringement through its affirmative acts, including by designing, manufacturing, selling, distributing, importing, and otherwise making available the '189 Accused Products and the accused functionality, and by providing instructions, user guides, product manuals, support webpages, marketing materials, advertisements, online technical support, and other documentation that instruct and encourage customers and end users to use the accused functionality in the manner that infringes the '189 Patent in the United States. Samsung, for example, advertises the infringing use, including via marketing materials, press releases and on-line videos, provides instructions on how to use the '189 Accused Products to infringe, including via user manuals and guides that are specific to carriers or an unlocked device, and provides on line technical support as well as 24/7 dedicated call line support for onboarding and troubleshooting that instructs or assists customers and end users to use the accused EN-DC dual-connectivity functionality and perform the infringing use. *See, e.g.,* https://www.samsung.com/global/business/networks/insights/blog/samsung-5g-interview-with-rd-team-4g-5g-network-dual-connectivity-en-dc/;    https://www.samsung.com/us/support/#; https://www.samsung.com/us/support/downloads/; https://www.samsung.com/us/support/downloads/?model=N0061630;

https://www.samsung.com/us/support/samsung-care-plus/home-appliances-and-electronics/;
https://news.samsung.com/us/samsung-qualcomm-verizon-demonstration-spotlighting-rapid-progress;     https://news.samsung.com/us/samsung-breaks-5g-speed-record-reaching-5-23gbps/;
https://news.samsung.com/us/samsung-achieves-industry-first-expands-virtualized-ran-capability-support-c-band-massive-mimo-radio/;
https://www.samsung.com/global/business/networks/insights/press-release/sk-telecom-and-samsung-completed-4g-5g-network-dual-connectivity-test-achieving-265gbps/;
https://www.youtube.com/watch?v=MQzipcvhfPA. As a result of Samsung's inducement, Samsung's customers and end users use the '189 Accused Products in the way that Samsung intends and directly infringes the '189 Patent. Samsung does so knowing and intending that its customers and end users will commit these infringing acts, and a reasonable inference is that Samsung specifically intended for others to directly infringe one or more claims of the '189 Patent.

72.     Samsung also indirectly infringes one or more claims of the '189 Patent under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, and selling the '189 Accused Products, including the accused EN-DC dual-connectivity functionality, which constitutes a material part of the claimed inventions, is especially made or adapted for use in an infringing manner, and is not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the portion of Accused Products with the accused EN-DC dual-connectivity functionality is a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process. The portion of Accused Products with the accused EN-DC dual-connectivity functionality is a material part of the claimed inventions and is not a staple article or commodity

of commerce suitable for substantial non-infringing use. Further, Samsung knows that the portion of the Accused Products with the accused EN-DC dual-connectivity functionality is especially made or especially adapted for use in infringement of the '189 Patent.

73. At least as of June 12, 2026 and no later than the filing and service of this Complaint, Samsung has had actual knowledge of the '189 Patent and of its infringement thereof, yet continues to make, use, sell, offer for sale, and import the '189 Accused Products.

74. Upon information and belief, Samsung derives substantial revenue, directly and indirectly, from making, using, selling, offering for sale, and importing the '189 Accused Products in this District and elsewhere in the United States.

75. Signal Point has been damaged by Samsung's infringement of the '189 Patent and will continue to be damaged unless that infringement is enjoined, in an amount to be proven at trial but no less than a reasonable royalty.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 7,890,743

76. Signal Point incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

77. Signal Point has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products or services that embody the inventions of the '743 Patent.

78. Samsung has infringed and continues to directly and indirectly infringe the '743 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b) and (c), including by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, the '743 Accused Products. The '743 Accused Products include Samsung Galaxy S-series, A-series, and Z-series smartphones that implement the Extend Unlock

27

feature (formerly Smart Lock). As shown in the exemplary claim chart attached as **Exhibit F**, these products are covered by one or more claims of the '743 Patent, including at least claim 1.

79.    For example, claim 1 of the '743 Patent is reproduced below:

1. A method for configuring a user device, the method comprising:

establishing, in the user device, a configuration rule for the user device, wherein the configuration rule (i) controls a configuration parameter for the user device, and (ii) is based at least in part on a required proximity between the user device and at least a first enabling device;

wherein at least the first enabling device is a general-purpose device, and wherein establishing the configuration rule in the device requires no further activation;

determining whether the configuration rule is satisfied;

when the configuration rule is satisfied, configuring the user device according to the configuration parameter, wherein the user device operates in accordance with the configuration parameter; and

when the configuration rule is not satisfied, disabling the configuration parameter.

80.    The '743 Accused Products meet each limitation of at least claim 1 of the '743 Patent, as set forth in detail in the exemplary claim chart attached as **Exhibit F** and as summarized below.

81.    As to the preamble, each '743 Accused Product is a user device that performs a method for configuring the device through the Extend Unlock feature. Extend Unlock is a trust-based feature built into Samsung Galaxy phones that automatically configures the device's lock-screen behavior according to the device's proximity to a registered trusted device.

82.    As to the first limitation, each '743 Accused Product establishes a configuration rule when the user registers a trusted device (the first enabling device)—such as a Galaxy Watch, Bluetooth earbuds, or a car Bluetooth audio system—within the Extend Unlock settings. The rule (i) controls the device's lock-screen state (the configuration parameter), keeping the device

28

unlocked for up to four hours or until it disconnects from all trusted devices, and (ii) is based on the required Bluetooth proximity between the Galaxy device and the trusted device, because the unlocked state depends on the trusted device's continued Bluetooth connection.



*Left: a registered trusted device under "Trusted devices." Right: the Galaxy device showing "Phone unlocked by Extend Unlock" while the trusted device is connected*

83.    As to the second limitation, the registered trusted device is a general-purpose device: a Galaxy Watch, Bluetooth earbuds, and a car Bluetooth audio system each serve a primary purpose—fitness tracking and notifications, audio playback, and hands-free calling and music, respectively—that is entirely unrelated to unlocking the phone. Once the trusted device is registered under the Extend Unlock settings, the configuration rule operates entirely automatically

and requires no further activation: the Galaxy device recognizes the trusted device's Bluetooth signal and configures the lock-screen state without any further user input.

84.    As to the third limitation, each '743 Accused Product determines whether the configuration rule is satisfied by continuously and automatically monitoring whether the registered trusted device is within Bluetooth proximity of the device. When the trusted device is detected within proximity, the device determines the rule satisfied; when the trusted device is no longer within proximity, the device determines the rule not satisfied.

85.    As to the fourth limitation, when the configuration rule is satisfied—i.e., the trusted device is within Bluetooth proximity—each '743 Accused Product configures itself according to the configuration parameter by modifying its lock-screen state to remain unlocked, and the device operates in accordance with that parameter, displaying "Phone unlocked by Extend Unlock" and allowing the user to access the device without re-entering a PIN, password, or pattern for as long as the rule remains satisfied.

86.    As to the fifth limitation, when the configuration rule is not satisfied—i.e., the trusted device leaves Bluetooth proximity or the device is disconnected from all trusted devices (or after four hours)—each '743 Accused Product disables the configuration parameter and reverts to its standard locked state, requiring the user to enter a PIN, password, or pattern to access the device.

87.    Samsung's infringement of the '743 Patent is shown on a limitation-by-limitation basis in the exemplary claim chart attached as **Exhibit F**. Samsung directly infringes at least claim 1 of the '743 Patent by, for example, using and testing the '743 Accused Products.

88.    Samsung also directs and controls others', for example, customers' and end users', use of the '743 Accused Products and the accused Extend Unlock functionality.

89.     Samsung also indirectly infringes one or more claims of the '743 Patent under 35 U.S.C. § 271(b) by inducing infringement by others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States. Samsung has known of the '743 Patent and its infringement thereof at least as of the communications detailed herein and no later than the filing and service of this Complaint. Since at least that time, Samsung has been on notice of its infringement and actively induced and continues to induce infringement by others. For example, Samsung's customers and end users directly infringe the '743 Patent, as shown, for example, in **Exhibit F,** through their ordinary, intended, and customary use of the '743 Accused Products and the accused Extend Unlock functionality. Samsung intends to cause and has taken affirmative steps to induce that direct infringement through its affirmative acts, including by designing, manufacturing, selling, distributing, importing, and otherwise making available the '743 Accused Products and the accused functionality, and by providing instructions, user guides, product manuals, support webpages, marketing materials, advertisements, online technical support, and other documentation that instruct and encourage customers and end users to use the accused functionality in the manner that infringes the '743 Patent in the United States. Samsung, for example, advertises the infringing use, including via marketing materials, press releases and on-line videos, provides instructions on how to use the '743 Accused Products to infringe, including via user manuals and guides that are specific to carriers or an unlocked device, and provides on line technical support as well as 24/7 dedicated call line support for onboarding and troubleshooting that instructs or assists customers and end users to use the accused Extend Unlock functionality     and     perform     the     infringing     use.     *See,     e.g.,* https://www.samsung.com/ae/support/mobile-devices/what-is-extend-unlock-feature-and-how-do-i-set-it-on/;     https://r1.community.samsung.com/t5/others/extend-unlock-keep-your-galaxy-

device-unlocked-when-trusted/td-p/25981290 (Samsung personnel responsible for posting in Samsung Community); https://www.samsung.com/us/support/answer/ANS10001343/; https://www.samsung.com/us/support/answer/ANS10002366/ (lock or unlock dropdown); https://www.samsung.com/us/support/#; https://www.samsung.com/us/support/downloads/; https://www.samsung.com/us/support/downloads/?model=N0061630; https://www.samsung.com/us/support/samsung-care-plus/home-appliances-and-electronics/. As a result of Samsung's inducement, Samsung's customers and end users use the '743 Accused Products in the way that Samsung intends and directly infringes the '743 Patent. Samsung does so knowing and intending that its customers and end users will commit these infringing acts, and a reasonable inference is that Samsung specifically intended for others to directly infringe one or more claims of the '743 Patent.

90.    Samsung also indirectly infringes one or more claims of the '743 Patent under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, and selling the '743 Accused Products, including the accused Extend Unlock functionality, which constitutes a material part of the claimed inventions, is especially made or adapted for use in an infringing manner, and is not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the portion of Accused Products with the accused Extend Unlock functionality is a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process. The portion of Accused Products with the accused Extend Unlock functionality is a material part of the claimed inventions and is not a staple article or commodity of commerce suitable for substantial non-infringing use. Further, Samsung knows that the portion of the Accused

32

Products with the accused Extend Unlock functionality is especially made or especially adapted for use in infringement of the '743 Patent.

91.    At least as of June 12, 2026 and no later than the filing and service of this Complaint, Samsung has had actual knowledge of the '743 Patent and of its infringement thereof, yet continues to make, use, sell, offer for sale, and import the '743 Accused Products.

92.    Upon information and belief, Samsung derives substantial revenue, directly and indirectly, from making, using, selling, offering for sale, and importing the '743 Accused Products in this District and elsewhere in the United States.

93.    Signal Point has been damaged by Samsung's infringement of the '743 Patent and will continue to be damaged unless that infringement is enjoined, in an amount to be proven at trial but no less than a reasonable royalty.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 9,634,911

94.    Signal Point incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

95.    Signal Point has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products or services that embody the inventions of the '911 Patent.

96.    Samsung has infringed and continues to directly and indirectly infringe the '911 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b) and (c), including by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, the '911 Accused Products. The '911 Accused Products include Samsung Galaxy smartphones running One UI on Android that perform on-device event detection and system-log capture through the pre-installed Samsung Members application (including its Error reports / Send feedback and Diagnostics functions) and the device's associated bug-report

capture. As shown in the exemplary claim chart attached as **Exhibit G**, these products are covered by one or more claims of the '911 Patent, including at least claim 1.

97.     For example, claim 1 of the '911 Patent is reproduced below:

1. A method comprising:

detecting, by a processor, one of a user interaction or a timer event in a first communication device;

in response to detecting the one of the user interaction or the timer event, associating, by the processor, a first timestamp with the one of the user interaction or the timer event; and

in response to detecting the one of the user interaction or the timer event in the first communication device, storing, by the processor on the first communication device, the one of the user interaction or the timer event, and the first timestamp in a first packet log file associated with the first communication device,

wherein the at least one of the user interaction or the timer event and the associated first timestamp are stored separately in the first packet log file from information associated with packets sent on a network and wherein the first packet log file also comprises one or more packets sent on the network, each with separate timestamps.

98.     The '911 Accused Products meet each limitation of at least claim 1 of the '911 Patent, as set forth in detail in the exemplary claim chart attached as **Exhibit G** and as summarized below.

99.     As to the preamble, each '911 Accused Product is a Samsung Galaxy smartphone running One UI on Android that performs an on-device error-reporting and system-log capture method carried out through its pre-installed Samsung Members application. Through the application's Error reports / Send feedback function, the Galaxy device detects events occurring on the device, associates a time with each, and stores them in a device-resident log that the user can submit to Samsung for diagnosis.

100.    As to the first limitation, the Galaxy device's application processor detects a user interaction or a timer event in the device. The user interaction includes a Hold or Mute call-control

34

input, which is rendered and handled by Samsung's proprietary In-Call UI package (com.samsung.android.incallui) and captured in the device's input diagnostics. The timer event includes the expiration of Samsung's One UI inactivity-based power-conservation timer—for example, placing an unused application into "Sleeping" or "Deep sleeping" mode—which the device records as a discrete standby-state-change event.

101.    As to the second limitation, in response to detecting the user interaction or timer event, the Galaxy device's processor associates a first timestamp with that event. Each log entry the device records carries its own date, time of occurrence, process and thread identifiers, tag, package name, priority, and message, and the device records this per-entry timing in the default "threadtime" format, which prefixes every event record with its date and invocation time.

### Control log output format

Log messages contain a number of metadata fields in addition to the tag and priority. You can modify the output format for messages so that they display a specific metadata field. To do so, use the `-v` option and specify one of the following supported output formats:

- `brief` : Displays priority, tag, and PID of the process issuing the message.
- `long` : Displays all metadata fields and separate messages with blank lines.
- `process` : Displays PID only.
- `raw` : Displays the raw log message with no other metadata fields.
- `tag` : Displays the priority and tag only.
- `thread:` A legacy format that shows priority, PID, and TID of the thread issuing the message.
- `threadtime` (default): Displays the date, invocation time, priority, tag, PID, and TID of the thread issuing the message.
- `time` : Displays the date, invocation time, priority, tag, and PID of the process issuing the message.

*The device records each event with its own date and time (default "threadtime" format)*

102.    As to the third limitation, in response to detecting the user interaction or timer event, the Galaxy device's processor stores that event, together with its associated first timestamp, in a first packet log file associated with and located on the device—namely the device-resident bug-report file (bugreport-BUILD_ID-DATE.zip) compiled through the pre-installed Samsung Members application. Selecting "Send system log data" under the Error reports / Send feedback

function directs the device to compile its system log data and write it to the device's own log directory as a single ZIP file that contains the system message logs (logcat), the error logs (dumpstate), and the system-service diagnostic output (dumpsys). Because the Galaxy device generates, writes, and retains this file in local storage, the storing occurs on the first communication device and the file is associated with the first communication device.



*Samsung Members "Error reports" screen; selecting "Send system log data" compiles and stores the device log on the device*

103.    As to the fourth limitation, within that single bug-report file the Galaxy device stores the user interaction or timer event and its associated first timestamp as discrete, individually

timestamped entries that are maintained separately from the network/packet information the same file carries; and the same file also comprises one or more packets sent on the network, each with its own separate timestamp, recorded in the file's radio-interface and network records (for example, the RADIO buffer and the dumpsys/netstat network data), each entry beginning with its own timestamp. The event records and the timestamped network-packet records are thereby maintained together in one device-resident file, while remaining separate from one another.

104.    Samsung's infringement of the '911 Patent is shown on a limitation-by-limitation basis in the exemplary claim chart attached as **Exhibit G**. Samsung directly infringes at least claim 1 of the '911 Patent by, for example, using and testing the '911 Accused Products.

105.    Samsung also directs and controls others', for example, customers' and end users', use of the '911 Accused Products and the accused Samsung Members event-and-diagnostics logging functionality.

106.    Samsung also indirectly infringes one or more claims of the '911 Patent under 35 U.S.C. § 271(b) by inducing infringement by others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States. Samsung has known of the '911 Patent and its infringement thereof at least as of the communications detailed herein and no later than the filing and service of this Complaint. Since at least that time, Samsung has been on notice of its infringement and actively induced and continues to induce infringement by others. For example, Samsung's customers and end users directly infringe the '911 Patent, as shown, for example, in **Exhibit G,** through their ordinary, intended, and customary use of the '911 Accused Products and the accused Samsung Members event-and-diagnostics logging functionality. Samsung intends to cause and has taken affirmative steps to induce that direct infringement through its affirmative acts, including by designing, manufacturing, selling, distributing,

importing, and otherwise making available the '911 Accused Products and the accused functionality, and by providing instructions, user guides, product manuals, support webpages, marketing materials, advertisements, online technical support, and other documentation that instruct and encourage customers and end users to use the accused functionality in the manner that infringes the '911 Patent in the United States. Samsung, for example, advertises the infringing functionality and use, including via marketing materials, press releases and on-line videos, provides instructions on how to use the '911 Accused Products to infringe, including via user manuals and guides that are specific to carriers or an unlocked device, and provides on line technical support as well as 24/7 dedicated call line support for onboarding and troubleshooting that instructs or assists customers and end users to use the Samsung Members event-and-diagnostics logging functionality and perform the infringing use. *See, e.g.*, https://www.samsung.com/us/apps/samsung-members/;

https://docs.samsungknox.com/admin/knox-asset-intelligence/how-to-guides/view-diagnostics/;

https://docs.samsungknox.com/admin/fundamentals/kbas/kba-115013353688-mobile-device-logs/; https://www.samsung.com/us/support/downloads/?model=N0061630;

https://www.samsung.com/us/support/#; https://www.samsung.com/us/support/downloads/;

https://www.samsung.com/us/support/samsung-care-plus/home-appliances-and-electronics/. As a result of Samsung's inducement, Samsung's customers and end users use the '911 Accused Products in the way that Samsung intends and directly infringes the '911 Patent. Samsung does so knowing and intending that its customers and end users will commit these infringing acts, and a reasonable inference is that Samsung specifically intended for others to directly infringe one or more claims of the '911 Patent.

107.    Samsung also indirectly infringes one or more claims of the '911 Patent under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, and selling the '911 Accused Products, including the accused Samsung Members event-and-diagnostics logging functionality, which constitutes a material part of the claimed inventions, is especially made or adapted for use in an infringing manner, and is not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the portion of Accused Products with the accused Samsung Members event-and-diagnostics logging functionality is a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process. The portion of Accused Products with the accused Samsung Members event-and-diagnostics logging functionality is a material part of the claimed inventions and is not a staple article or commodity of commerce suitable for substantial non-infringing use. Further, Samsung knows that the portion of the Accused Products with the accused Samsung Members event-and-diagnostics logging functionality is especially made or especially adapted for use in infringement of the '911 Patent.

108.    At least as of June 12, 2026 and no later than the filing and service of this Complaint, Samsung has had actual knowledge of the '911 Patent and of its infringement thereof, yet continues to make, use, sell, offer for sale, and import the '911 Accused Products.

109.    Upon information and belief, Samsung derives substantial revenue, directly and indirectly, from making, using, selling, offering for sale, and importing the '911 Accused Products in this District and elsewhere in the United States.

39

110.   Signal Point has been damaged by Samsung's infringement of the '911 Patent and will continue to be damaged unless that infringement is enjoined, in an amount to be proven at trial but no less than a reasonable royalty.

### COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 7,684,333

111.   Signal Point incorporates by reference and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

112.   Signal Point has not licensed or otherwise authorized Samsung to make, use, offer for sale, sell, or import any products or services that embody the inventions of the '333 Patent.

113.   Samsung has infringed and continues to directly and indirectly infringe the '333 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b) and (c), including by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, the '333 Accused Products. The '333 Accused Products include Samsung Galaxy smartphones that operate as IEEE 802.11be (Wi-Fi 7) stations and implement Enhanced Distributed Channel Access (EDCA) together with Restricted Target Wake Time (r-TWT) scheduling, including without limitation the Galaxy S25 (Qualcomm FastConnect 7800) and the Galaxy S26 Ultra (Qualcomm FastConnect 7900). As shown in the exemplary claim chart attached as **Exhibit H**, these products are covered by one or more claims of the '333 Patent, including at least claim 1.

114.   For example, claim 1 of the '333 Patent is reproduced below:

1. In a wireless network, a method of allocating bandwidth of a wireless channel to different types of traffic, the method comprising:

partitioning bandwidth of the wireless channel into a plurality of contention periods;

associating traffic flows with access categories;

assigning one or more of the access categories to each contention period; and

40

contending for access to the wireless channel by traffic flows associated with a proper subset of the access categories during at least one of the contention periods.

115.    The '333 Accused Products meet each limitation of at least claim 1 of the '333 Patent, as set forth in detail in the exemplary claim chart attached as **Exhibit H** and as summarized below.

116.    As to the preamble, each '333 Accused Product operates as an IEEE 802.11be (Wi-Fi 7) station associated within a basic service set in a wireless network and, through its 802.11 QoS facility, apportions access to the shared wireless medium by means of EDCA contention and r-TWT scheduling among per-priority access categories and scheduled traffic identifiers—that is, it allocates bandwidth of a wireless channel to different types of traffic. Samsung identifies Restricted TWT as a Wi-Fi 7 feature supporting predictable low-latency, lower-jitter transmission.

| ⚙ Hardware | |
|---|---|
| System chip | Snapdragon 8 Elite SM8750-AB (3 nm) |
| Processor | Octa-core<br>2×4.47GHz Oryon V2 PhoenixL<br>6×3.53GHz Oryon V2 PhoenixM |
| GPU | Adreno 830 |
| Memory | 12GB (LPDDR5X)/128GB (UFS 4.0)<br>12GB/256GB<br>12GB/512GB |
| Storage expansion | not expandable |
| OS | Android (15), up to 7 OS updates |

*The accused Galaxy devices pair the Snapdragon 8 Elite platform with Qualcomm FastConnect Wi-Fi 7 connectivity*

As noted in an article concerning a Samsung-Netgear collaborative effort: "[t]hanks to the successful interoperability testing between NETGEAR and Samsung, our WiFi 7 solutions will deliver users a continuous wireless experience with higher throughput and lower latency," said Joonsuk Kim, executive vice president of the System LSI Connectivity Development Team at Samsung Electronics. "The latest Wi-Fi 7 technology in our chipset is designed to ensure seamless connectivity for mobile devices across a wide range of networks, including strong

compatibility with NETGEAR's network solutions."

https://www.netgear.com/hub/pressroom/enterprise/samsung-wifi-7-netgear/

117.    As to the first claim limitation, each '333 Accused Product partitions the bandwidth of the 802.11be wireless channel into a plurality of contention periods by organizing channel airtime into recurring, successive intervals—the r-TWT Service Periods and the ordinary contention intervals between them. Each r-TWT Service Period is announced by the associated access point in the broadcast TWT element, and the accused device determines the period boundaries from that schedule and governs its transmissions accordingly. The Qualcomm FastConnect 7900 and FastConnect 7800 connectivity controllers in the accused devices implement Target Wake Time and Wi-Fi QoS Management, which provide these scheduled service-period mechanisms.

118.    As to the second claim limitation, each '333 Accused Product associates traffic flows with access categories by mapping each traffic stream, by its user priority / Traffic Identifier (TID), to one of the four 802.11 access categories—AC_VO (voice), AC_VI (video), AC_BE (best effort), and AC_BK (background)—in accordance with the standard user-priority-to-access-category mapping carried forward into 802.11be. The Wi-Fi QoS Management feature additionally assigns a user priority to each outgoing IP packet based on its DSCP marking, which is then mapped to its access category.

119.    As to the third claim limitation, each '333 Accused Product assigns one or more of the access categories to each contention period: in each individually addressed r-TWT Setup frame, the device populates the Restricted TWT downlink and uplink TID Bitmap subfields, which designate the TIDs treated as latency-sensitive for that schedule. Because each TID corresponds to a user priority and the standard fixes the user-priority-to-access-category mapping, designating

42

a TID necessarily designates its corresponding access category, tying each r-TWT Service Period to a specific subset of access categories that receive prioritized access during that period.

## r-TWT Schedule Info:

This r-TWT schedule info field provides details about the r-TWT session (e.g., Active, Full, etc.).

- A bit value of 0 indicates that the schedule is suspended or idle.
- A bit value of 1 signifies that the r-TWT schedule is active.
- A bit value of 2 means the TWT group membership is full, and the AP may reject any r-TWT requests.
- A bit value of 3 indicates that the session is active for a non-transmitted or co-hosted BSSID.

## r-TWT traffic info:

This element specifies the UL/DL TID bitmaps for latency-sensitive traffic. It uses the following sub-fields to inform the STA about traffic prioritization:

- r-TWT UL TID Bitmap
- r-TWT DL TID Bitmap

## Note:

The Restricted TWT Traffic Info field is included only in individually addressed TWT Setup frames for establishing an R-TWT schedule to negotiate the set of R-TWT UL and/or DL TIDs. This information is not present in R-TWT schedules advertised in the TWT element within Beacon frames.

*The r-TWT schedule designates UL/DL TID bitmaps—and thus access categories—for each Service Period*

120. As to the fourth claim limitation, during at least one of the contention periods, namely an r-TWT Service Period, each '333 Accused Product contends for access to the wireless channel by traffic flows associated with a proper subset of the access categories, because only the traffic flows carrying the schedule's designated TIDs (which map to a limited subset of the four access categories) contend during that period. Access during the period remains contention-based, governed by the Restricted TWT EDCA Parameter Set, while the associated access point protects the schedule and silences stations outside it so that traffic in the non-designated access categories does not contend during that period.

43

121. Samsung's infringement of the '333 Patent is shown on a limitation-by-limitation basis in the exemplary claim chart attached as **Exhibit H**. Samsung directly infringes at least claim 1 of the '333 Patent by, for example, using and testing the '333 Accused Products.

122. Samsung also directs and controls others', for example, customers' and end users', use of the '333 Accused Products and the accused Wi-Fi 7 EDCA and Restricted TWT functionality.

123. Samsung also indirectly infringes one or more claims of the '333 Patent under 35 U.S.C. § 271(b) by inducing infringement by others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States. Samsung has known of the '333 Patent and its infringement thereof at least as of the communications detailed herein and no later than the filing and service of this Complaint. Since at least that time, Samsung has been on notice of its infringement and actively induced and continues to induce infringement by others. For example, Samsung's customers and end users directly infringe the '333 Patent, as shown, for example, in **Exhibit H,** through their ordinary, intended, and customary use of the '333 Accused Products and the accused Wi-Fi 7 EDCA and Restricted TWT functionality. Samsung intends to cause and has taken affirmative steps to induce that direct infringement through its affirmative acts, including by designing, manufacturing, selling, distributing, importing, and otherwise making available the '333 Accused Products and the accused functionality, and by providing instructions, user guides, product manuals, support webpages, marketing materials, advertisements, online technical support, and other documentation that instruct and encourage customers and end users to use the accused functionality in the manner that infringes the '333 Patent in the United States. Samsung, for example, advertises the infringing use, including via marketing materials, press releases and on-line videos, provides instructions on how to use the '333 Accused Products to

44

infringe, including via user manuals and guides that are specific to carriers or an unlocked device, and provides on line technical support as well as 24/7 dedicated call line support for onboarding and troubleshooting that instructs or assists customers and end users to use the accused Wi-Fi 7 EDCA and Restricted TWT functionality and perform the infringing use. *See, e.g.*, https://eu.community.samsung.com/t5/galaxy-s24-series/there-is-a-hidden-secret-connectivity-labs-option-in-the-wifi/td-p/9327055; https://www.sammobile.com/news/samsung-galaxy-s25-wi-fi-7-all-models/#goog_rewarded; https://www.samsung.com/ph/support/mobile-devices/enjoy-faster-connectivity-with-wi-fi-6e-and-intelligent-wi-fi/; https://docs.samsungknox.com/admin/knox-platform-for-enterprise/kbas/kba-360034073174/; https://www.samsung.com/us/support/#; https://www.samsung.com/us/support/downloads/; https://www.samsung.com/us/support/downloads/?model=N0061630; https://www.samsung.com/us/support/samsung-care-plus/home-appliances-and-electronics/. As a result of Samsung's inducement, Samsung's customers and end users use the '333 Accused Products in the way that Samsung intends and directly infringes the '333 Patent. Samsung does so knowing and intending that its customers and end users will commit these infringing acts, and a reasonable inference is that Samsung specifically intended for others to directly infringe one or more claims of the '333 Patent.

124.    Samsung also indirectly infringes one or more claims of the '333 Patent under 35 U.S.C. § 271(c) by contributing to the infringement of others, including, for example, Samsung's customers and end users, in this District and elsewhere in the United States by making, using, offering for sale, importing, and selling the '333 Accused Products, including the accused Wi-Fi 7 EDCA and Restricted TWT functionality, which constitutes a material part of the claimed inventions, is especially made or adapted for use in an infringing manner, and is not a staple article

or commodity of commerce suitable for substantial non-infringing use. For example, the portion of Accused Products with the accused Wi-Fi 7 EDCA and Restricted TWT functionality is a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process. The portion of Accused Products with the accused Wi-Fi 7 EDCA and Restricted TWT functionality is a material part of the claimed inventions and is not a staple article or commodity of commerce suitable for substantial non-infringing use. Further, Samsung knows that the portion of the Accused Products with the accused Wi-Fi 7 EDCA and Restricted TWT functionality is especially made or especially adapted for use in infringement of the '333 Patent.

125. At least as of June 12, 2026 and no later than the filing and service of this Complaint, Samsung has had actual knowledge of the '333 Patent and of its infringement thereof, yet continues to make, use, sell, offer for sale, and import the '333 Accused Products.

126. Upon information and belief, Samsung derives substantial revenue, directly and indirectly, from making, using, selling, offering for sale, and importing the '333 Accused Products in this District and elsewhere in the United States.

127. Signal Point has been damaged by Samsung's infringement of the '333 Patent and will continue to be damaged unless that infringement is enjoined, in an amount to be proven at trial but no less than a reasonable royalty.

## COMPLIANCE WITH 35 U.S.C. § 287

128. Signal Point has complied with the requirements of 35 U.S.C. § 287(a). With respect to each Asserted Patent, Signal Point has not made, offered for sale, or sold any products in the United States and has not imported any products into the United States that are subject to the marking requirements of 35 U.S.C. § 287(a). Moreover, Signal Point is only presently asserting

method claims from the Asserted Patents. The marking requirement of 35 U.S.C. § 287(a) does not apply when a patentee only asserts infringement of method claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Signal Point Networks, LLC moves this Honorable Court for judgment to be entered in its favor and against Defendant, Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., and for the following relief:

(i)     A judgment in favor of Signal Point that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '189 Patent;

(ii)    A judgment in favor of Signal Point that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '743 Patent;

(iii)   A judgment in favor of Signal Point that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '911 Patent;

(iv)    A judgment in favor of Signal Point that Samsung has infringed, directly and indirectly, by way of inducement and/or contributory infringement, literally and/or under the doctrine of equivalents, one or more claims of the '333 Patent;

(v)     An award of damages to which Signal Point is entitled under 35 U.S.C. § 284 for Samsung's past infringement and any continuing infringement or infringement post-trial up until the date a final judgment is entered, including both compensatory damages and treble damages for willful infringement;

(vi)    Signal Point's actual damages in an amount sufficient to compensate Signal Point for Samsung's infringement of the Asserted Patents until such time as Samsung ceases its infringing conduct, including supplemental damages post-verdict;

(vii)   A judgment and order against Samsung for exemplary damages as determined by the trier of fact;

(viii)  A judgment that Samsung's infringement has been willful;

(ix)    Pre- and post-judgment interest as allowed by law on any damages awarded to Signal Point;

(x)     A judgment and order requiring Samsung to pay the costs of this action (including all disbursements), as well as attorneys' fees as provided by 35 U.S.C. § 285;

47

(xi)    A judgment and order requiring Samsung to pay compulsory ongoing licensing fees to Signal Point, as determined by the Court in equity; and

(xii)   A declaration that the '189 Patent is valid and enforceable;

(xiii)  A declaration that the '743 Patent is valid and enforceable;

(xiv)   A declaration that the '911 Patent is valid and enforceable;

(xv)    A declaration that the '333 Patent is valid and enforceable; and

(xvi)   Such other and further relief as this Court shall deem appropriate.

## DEMAND FOR JURY TRIAL

Signal Point demands a trial by jury of any and all issues triable of right before a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## RESERVATION OF RIGHTS

Plaintiff's investigation is ongoing, and certain material information remains in the sole possession of the Defendants or third parties, which will be obtained via discovery herein. Plaintiff expressly reserves the right to amend or supplement the causes of action set forth herein in accordance with Rule 15 of the Federal Rules of Civil Procedure.

DATED: June 24, 2026                    Respectfully submitted,

/s/ *Blair M. Jacobs by permission Claire Henry*
Blair M. Jacobs (Lead Attorney)
D.C. Bar No. 471024
bjacobs@bsfllp.com
Christina A. Ondrick
D.C. Bar No. 494625
condrick@bsfllp.com
John S. Holley
Texas Bar No. 24078678
jholley@bsfllp.com
Andrew R. Huntsinger
(pro hac vice forthcoming)
**BOIES SCHILLER FLEXNER LLP**

48

1401 New York Ave. N.W.
Washington, D.C. 20005
Telephone: (202) 237-2727
Facsimile:  (202) 237-6131

Claire A. Henry
Texas Bar No. 24053063
Email: claire@millerfairhenry.com
Andrea L. Fair
Texas Bar No. 24078488
Email: andrea@millerfairhenry.com
Garrett C. Parish
State Bar No. 24125824
garrett@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Pkwy.
Longview, Texas 75604
Telephone: (903) 757-6400
Facsimile:  (903) 757-2323

**ATTORNEYS FOR PLAINTIFF
SIGNAL POINT NETWORKS, LLC**